# MICHIGAN *v.* TYLER ET AL.

No. 76–1608.   Argued January 10, 1978—Decided May 31, 1978

500

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, J., joined; in all but Part IV-A of which WHITE and MARSHALL, JJ., joined; in Parts I, III, and IV of which STEVENS, J., joined; and in Parts I, III, and IV-A of which BLACKMUN, J., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 512. WHITE, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 514. REHNQUIST, J., filed a dissenting opinion, *post*, p. 516. BRENNAN, J., took no part in the consideration or decision of the case.

*Jeffrey Butler* argued the cause *pro hac vice* for petitioner. With him on the brief was *L. Brooks Patterson.*

*Jesse R. Bacalis* argued the cause and filed a brief for respondents.

MR. JUSTICE STEWART delivered the opinion of the Court.

The respondents, Loren Tyler and Robert Tompkins, were convicted in a Michigan trial court of conspiracy to burn real property in violation of Mich. Comp. Laws § 750.157a (1970).[1] Various pieces of physical evidence and testimony based on personal observation, all obtained through unconsented and warrantless entries by police and fire officials onto the burned premises, were admitted into evidence at the respondents' trial. On appeal, the Michigan Supreme Court reversed the convictions, holding that "the warrantless searches were unconstitutional and that the evidence obtained was therefore inadmissible." 399 Mich. 564, 584, 250 N. W. 2d 467, 477 (1977). We granted certiorari to consider the applicability of the Fourth and Fourteenth Amendments to official entries onto fire-damaged premises. 434 U. S. 814.

I

Shortly before midnight on January 21, 1970, a fire broke out at Tyler's Auction, a furniture store in Oakland County, Mich. The building was leased to respondent Loren Tyler, who conducted the business in association with respondent Robert Tompkins. According to the trial testimony of various witnesses, the fire department responded to the fire and was "just watering down smoldering embers" when Fire Chief See arrived on the scene around 2 a. m. It was Chief See's responsibility "to determine the cause and make out all reports." Chief See was met by Lt. Lawson, who informed him that two

---

[1] In addition, Tyler was convicted of the substantive offenses of burning real property, Mich. Comp. Laws § 750.73 (1970), and burning insured property with intent to defraud, Mich. Comp. Laws § 750.75 (1970).

plastic containers of flammable liquid had been found in the building. Using portable lights, they entered the gutted store, which was filled with smoke and steam, to examine the containers. Concluding that the fire "could possibly have been an arson," Chief See called Police Detective Webb, who arrived around 3:30 a. m. Detective Webb took several pictures of the containers and of the interior of the store, but finally abandoned his efforts because of the smoke and steam. Chief See briefly "[l]ooked throughout the rest of the building to see if there was any further evidence, to determine what the cause of the fire was." By 4 a. m. the fire had been extinguished and the firefighters departed. See and Webb took the two containers to the fire station, where they were turned over to Webb for safekeeping. There was neither consent nor a warrant for any of these entries into the building, nor for the removal of the containers. The respondents challenged the introduction of these containers at trial, but abandoned their objection in the State Supreme Court. 399 Mich., at 570, 250 N. W. 2d, at 470.

Four hours after he had left Tyler's Auction, Chief See returned with Assistant Chief Somerville, whose job was to determine the "origin of all fires that occur within the Township." The fire had been extinguished and the building was empty. After a cursory examination they left, and Somerville returned with Detective Webb around 9 a. m. In Webb's words, they discovered suspicious "burn marks in the carpet, which [Webb] could not see earlier that morning, because of the heat, steam, and the darkness." They also found "pieces of tape, with burn marks, on the stairway." After leaving the building to obtain tools, they returned and removed pieces of the carpet and sections of the stairs to preserve these bits of evidence suggestive of a fuse trail. Somerville also searched through the rubble "looking for any other signs or evidence that showed how this fire was caused." Again, there was neither consent nor a warrant for these entries and seizures.

Both at trial and on appeal, the respondents objected to the introduction of evidence thereby obtained.

On February 16 Sergeant Hoffman of the Michigan State Police Arson Section returned to Tyler's Auction to take photographs.[2] During this visit or during another at about the same time, he checked the circuit breakers, had someone inspect the furnace, and had a television repairman examine the remains of several television sets found in the ashes. He also found a piece of fuse. Over the course of his several visits, Hoffman secured physical evidence and formed opinions that played a substantial role at trial in establishing arson as the cause of the fire and in refuting the respondents' testimony about what furniture had been lost. His entries into the building were without warrants or Tyler's consent, and were for the sole purpose "of making an investigation and seizing evidence." At the trial, respondents' attorney objected to the admission of physical evidence obtained during these visits, and also moved to strike all of Hoffman's testimony "because it was got in an illegal manner."[3]

The Michigan Supreme Court held that with only a few exceptions, any entry onto fire-damaged private property by fire or police officials is subject to the warrant requirements of the Fourth and Fourteenth Amendments. "[Once] the blaze [has been] extinguished and the firefighters have left the premises, a warrant is required to reenter and search the premises, unless there is consent or the premises have been abandoned." 399 Mich., at 583, 250 N. W. 2d, at 477. Apply-

---

[2] Sergeant Hoffman had entered the premises with other officials at least twice before, on January 26 and 29. No physical evidence was obtained as a result of these warrantless entries.

[3] The State's case was substantially buttressed by the testimony of Oscar Frisch, a former employee of the respondents. He described helping Tyler and Tompkins move valuable items from the store and old furniture into the store a few days before the fire. He also related that the respondents had told him there would be a fire on January 21, and had instructed him to place mattresses on top of other objects so that they would burn better.

ing this principle, the court ruled that the series of warrantless entries that began after the blaze had been extinguished at 4 a. m. on January 22 violated the Fourth and Fourteenth Amendments.[4] It found that the "record does not factually support a conclusion that Tyler had abandoned the fire-damaged premises" and accepted the lower court's finding that " '[c]onsent for the numerous searches was never obtained from defendant Tyler.' " *Id.*, at 583, 570–571, 250 N. W. 2d, at 476, 470. Accordingly, the court reversed the respondents' convictions and ordered a new trial.

## II

The decisions of this Court firmly establish that the Fourth Amendment extends beyond the paradigmatic entry into a private dwelling by a law enforcement officer in search of the fruits or instrumentalities of crime. As this Court stated in *Camara* v. *Municipal Court,* 387 U. S. 523, 528, the "basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." The officials may be health, fire, or building inspectors. Their purpose may be to locate and abate a suspected public nuisance, or simply to perform a routine periodic inspection. The privacy that is invaded may be

---

[4] Having concluded that warrants should have been secured for the post-fire searches, the court explained that different standards of probable cause governed searches to determine the cause of a fire and searches to gather evidence of crime. It then described what standard of probable cause should govern all the searches in this case:

"While it may be no easy task under some circumstances to distinguish as a factual matter between an administrative inspection and a criminal investigation, in the instant case the Court is not faced with that task. Having lawfully discovered the plastic containers of flammable liquid and other evidence of arson before the fire was extinguished, Fire Chief See focused his attention on assembling proof of arson and began a criminal investigation. At that point there was probable cause for issuance of a criminal investigative search warrant." 399 Mich., at 577, 250 N. W. 2d, at 474 (citations omitted).

sheltered by the walls of a warehouse or other commercial establishment not open to the public. *See* v. *Seattle,* 387 U. S. 541; *Marshall* v. *Barlow's, Inc., ante,* at 311–313. These deviations from the typical police search are thus clearly within the protection of the Fourth Amendment.

The petitioner argues, however, that an entry to investigate the cause of a recent fire is outside that protection because no individual privacy interests are threatened. If the occupant of the premises set the blaze, then, in the words of the petitioner's brief, his "actions show that he has no expectation of privacy" because "he has abandoned those premises within the meaning of the Fourth Amendment." And if the fire had other causes, "the occupants of the premises are treated as victims by police and fire officials." In the petitioner's view, "[t]he likelihood that they will be aggrieved by a possible intrusion into what little remains of their privacy in badly burned premises is negligible."

This argument is not persuasive. For even if the petitioner's contention that arson establishes abandonment be accepted, its second proposition—that innocent fire victims inevitably have no protectible expectations of privacy in whatever remains of their property—is contrary to common experience. People may go on living in their homes or working in their offices after a fire. Even when that is impossible, private effects often remain on the fire-damaged premises. The petitioner may be correct in the view that most innocent fire victims are treated courteously and welcome inspections of their property to ascertain the origin of the blaze, but "even if true, [this contention] is irrelevant to the question whether the . . . inspection is reasonable within the meaning of the Fourth Amendment." *Camara, supra,* at 536. Once it is recognized that innocent fire victims retain the protection of the Fourth Amendment, the rest of the petitioner's argument unravels. For it is, of course, impossible to justify a warrantless search on the ground of abandonment by arson

when that arson has not yet been proved, and a conviction cannot be used *ex post facto* to validate the introduction of evidence used to secure that same conviction.

Thus, there is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, or because his purpose is to ascertain the cause of a fire rather than to look for evidence of a crime, or because the fire might have been started deliberately. Searches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment. And under that Amendment, "one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara, supra,* at 528–529. The showing of probable cause necessary to secure a warrant may vary with the object and intrusiveness of the search,[5] but the necessity for the warrant persists.

The petitioner argues that no purpose would be served by requiring warrants to investigate the cause of a fire. This argument is grounded on the premise that the only fact that need be shown to justify an investigatory search is that a fire of undetermined origin has occurred on those premises. The

---

[5] For administrative searches conducted to enforce local building, health, or fire codes, " 'probable cause' to issue a warrant to inspect . . . exist[s] if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building (*e. g.*, a multi-family apartment house), or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling." *Camara,* 387 U. S., at 538; *Marshall* v. *Barlow's, Inc., ante,* at 320–321. See LaFave, Administrative Searches and the Fourth Amendment: The Camara and See Cases, 1967 Sup. Ct. Rev. 1, 18–20.

petitioner contends that this consideration distinguishes this case from *Camara,* which concerned the necessity for warrants to conduct routine building inspections. Whereas the occupant of premises subjected to an unexpected building inspection may have no way of knowing the purpose or lawfulness of the entry, it is argued that the occupant of burned premises can hardly question the factual basis for fire officials' wanting access to his property. And whereas a magistrate performs the significant function of assuring that an agency's decision to conduct a routine inspection of a particular dwelling conforms with reasonable legislative or administrative standards, he can do little more than rubberstamp an application to search fire-damaged premises for the cause of the blaze. In short, where the justification for the search is as simple and as obvious to everyone as the fact of a recent fire, a magistrate's review would be a time-consuming formality of negligible protection to the occupant.

The petitioner's argument fails primarily because it is built on a faulty premise. To secure a warrant to investigate the cause of a fire, an official must show more than the bare fact that a fire has occurred. The magistrate's duty is to assure that the proposed search will be reasonable, a determination that requires inquiry into the need for the intrusion on the one hand, and the threat of disruption to the occupant on the other. For routine building inspections, a reasonable balance between these competing concerns is usually achieved by broad legislative or administrative guidelines specifying the purpose, frequency, scope, and manner of conducting the inspections. In the context of investigatory fire searches, which are not programmatic but are responsive to individual events, a more particularized inquiry may be necessary. The number of prior entries, the scope of the search, the time of day when it is proposed to be made, the lapse of time since the fire, the continued use of the building, and the owner's efforts to secure it against intruders might all be relevant factors. Even though a fire victim's privacy must normally yield to the vital

social objective of ascertaining the cause of the fire, the magistrate can perform the important function of preventing harassment by keeping that invasion to a minimum. See *See* v. *Seattle,* 387 U. S., at 544–545; *United States* v. *Chadwick,* 433 U. S. 1, 9; *Marshall* v. *Barlow's, Inc., ante,* at 323.

In addition, even if fire victims can be deemed aware of the factual justification for investigatory searches, it does not follow that they will also recognize the legal authority for such searches. As the Court stated in *Camara,* "when the inspector demands entry [without a warrant], the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization." 387 U. S., at 532. Thus, a major function of the warrant is to provide the property owner with sufficient information to reassure him of the entry's legality. See *United States* v. *Chadwick, supra,* at 9.

In short, the warrant requirement provides significant protection for fire victims in this context, just as it does for property owners faced with routine building inspections. As a general matter, then, official entries to investigate the cause of a fire must adhere to the warrant procedures of the Fourth Amendment. In the words of the Michigan Supreme Court: "Where the cause [of the fire] is undetermined, and the purpose of the investigation is to determine the cause and to prevent such fires from occurring or recurring, a . . . search may be conducted pursuant to a warrant issued in accordance with reasonable legislative or administrative standards or, absent their promulgation, judicially prescribed standards; if evidence of wrongdoing is discovered, it may, of course, be used to establish probable cause for the issuance of a criminal investigative search warrant or in prosecution." But "[i]f the authorities are seeking evidence to be used in a criminal prosecution, the usual standard [of probable cause] will apply." 399 Mich., at 584, 250 N. W. 2d, at 477. Since all

the entries in this case were "without proper consent" and were not "authorized by a valid search warrant," each one is illegal unless it falls within one of the "certain carefully defined classes of cases" for which warrants are not mandatory. *Camara,* 387 U. S., at 528–529.

## III

Our decisions have recognized that a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant. *Warden* v. *Hayden,* 387 U. S. 294 (warrantless entry of house by police in hot pursuit of armed robber); *Ker* v. *California,* 374 U. S. 23 (warrantless and unannounced entry of dwelling by police to prevent imminent destruction of evidence). Similarly, in the regulatory field, our cases have recognized the importance of "prompt inspections, even without a warrant, . . . in emergency situations." *Camara, supra,* at 539, citing *North American Cold Storage Co.* v. *Chicago,* 211 U. S. 306 (seizure of unwholesome food); *Jacobson* v. *Massachusetts,* 197 U. S. 11 (compulsory smallpox vaccination); *Compagnie Francaise* v. *Board of Health,* 186 U. S. 380 (health quarantine).

A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry "reasonable." Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze. And once in a building for this purpose, firefighters may seize evidence of arson that is in plain view. *Coolidge* v. *New Hampshire,* 403 U. S. 443, 465–466. Thus, the Fourth and Fourteenth Amendments were not violated by the entry of the firemen to extinguish the fire at Tyler's Auction, nor by Chief See's removal of the two plastic containers of flammable liquid found on the floor of one of the showrooms.

Although the Michigan Supreme Court appears to have accepted this principle, its opinion may be read as holding that

the exigency justifying a warrantless entry to fight a fire ends, and the need to get a warrant begins, with the dousing of the last flame. 399 Mich., at 579, 250 N. W. 2d, at 475. We think this view of the firefighting function is unrealistically narrow, however. Fire officials are charged not only with extinguishing fires, but with finding their causes. Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring or a defective furnace. Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction. And, of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims. For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished.[6] And if the warrantless entry to put out the fire and determine its cause is constitutional, the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional.

## IV

### A

The respondents argue, however, that the Michigan Supreme Court was correct in holding that the departure by the fire

---

[6] The circumstances of particular fires and the role of firemen and investigating officials will vary widely. A fire in a single-family dwelling that clearly is extinguished at some identifiable time presents fewer complexities than those likely to attend a fire that spreads through a large apartment complex or that engulfs numerous buildings. In the latter situations, it may be necessary for officials—pursuing their duty both to extinguish the fire and to ascertain its origin—to remain on the scene for an extended period of time repeatedly entering or re-entering the building or buildings, or portions thereof. In determining what constitutes a "reasonable time to investigate," appropriate recognition must be given to the exigencies that confront officials serving under these conditions, as well as to individuals' reasonable expectations of privacy.

officials from Tyler's Auction at 4 a. m. ended any license they might have had to conduct a warrantless search. Hence, they say that even if the firemen might have been entitled to remain in the building without a warrant to investigate the cause of the fire, their re-entry four hours after their departure required a warrant.

On the facts of this case, we do not believe that a warrant was necessary for the early morning re-entries on January 22. As the fire was being extinguished, Chief See and his assistants began their investigation, but visibility was severely hindered by darkness, steam, and smoke. Thus they departed at 4 a. m. and returned shortly after daylight to continue their investigation. Little purpose would have been served by their remaining in the building, except to remove any doubt about the legality of the warrantless search and seizure later that same morning. Under these circumstances, we find that the morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence.

## B

The entries occurring after January 22, however, were clearly detached from the initial exigency and warrantless entry. Since all of these searches were conducted without valid warrants and without consent, they were invalid under the Fourth and Fourteenth Amendments, and any evidence obtained as a result of those entries must, therefore, be excluded at the respondents' retrial.

## V

In summation, we hold that an entry to fight a fire requires no warrant, and that once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze. Thereafter, additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches. See *Camara,* 387 U. S., at 534–539; *See* v. *Seattle,* 387 U. S., at 544–545; *Marshall* v.

*Barlow's, Inc., ante,* at 320–321. Evidence of arson discovered in the course of such investigations is admissible at trial, but if the investigating officials find probable cause to believe that arson has occurred and require further access to gather evidence for a possible prosecution, they may obtain a warrant only upon a traditional showing of probable cause applicable to searches for evidence of crime. *United States* v. *Ventresca,* 380 U. S. 102.

These principles require that we affirm the judgment of the Michigan Supreme Court ordering a new trial.[7]

*Affirmed.*

MR. JUSTICE BLACKMUN joins the judgment of the Court and Parts I, III, and IV–A of its opinion.

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

MR. JUSTICE STEVENS, concurring in part and concurring in the judgment.

Because Part II of the Court's opinion in this case, like the opinion in *Camara* v. *Municipal Court,* 387 U. S. 523, seems to

---

[7] The petitioner alleges that respondent Tompkins lacks standing to object to the unconstitutional searches and seizures. The Michigan Supreme Court refused to consider the State's argument, however, because the prosecutor failed to raise the issue in the trial court or in the Michigan Court of Appeals. 399 Mich., at 571, 250 N. W. 2d, at 470–471. We read the state court's opinion to mean that in the absence of a timely objection by the State, a defendant will be presumed to have standing. Failure to present a federal question in conformance with state procedure constitutes an adequate and independent ground of decision barring review in this Court, so long as the State has a legitimate interest in enforcing its procedural rule. *Henry* v. *Mississippi,* 379 U. S. 443, 447. See *Safeway Stores* v. *Oklahoma Grocers,* 360 U. S. 334, 342 n. 7; *Cardinale* v. *Louisiana,* 394 U. S. 437, 438. The petitioner does not claim that Michigan's procedural rule serves no legitimate purpose. Accordingly, we do not entertain the petitioner's standing claim which the state court refused to consider because of procedural default.

assume that an official search must either be conducted pursuant to a warrant or not take place at all, I cannot join its reasoning.

In particular, I cannot agree with the Court's suggestion that, if no showing of probable cause could be made, "the warrant procedures governing administrative searches," *ante,* at 511, would have complied with the Fourth Amendment. In my opinion, an "administrative search warrant" does not satisfy the requirements of the Warrant Clause.[1] See *Marshall* v. *Barlow's, Inc., ante,* p. 325 (STEVENS, J., dissenting). Nor does such a warrant make an otherwise unreasonable search reasonable.

A warrant provides authority for an unannounced, immediate entry and search. No notice is given when an application for a warrant is made and no notice precedes its execution; when issued, it authorizes entry by force.[2] In my view, when there is no probable cause to believe a crime has been committed and when there is no special enforcement need to justify an unannounced entry,[3] the Fourth Amendment neither requires nor sanctions an abrupt and peremptory confronta-

---

[1] The Warrant Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] See *Wyman* v. *James,* 400 U. S. 309, 323–324. As the Court observed in *Wyman,* a warrant is not simply a device providing procedural protections for the citizen; it also grants the government increased authority to invade the citizen's privacy. See *Miller* v. *United States,* 357 U. S. 301, 307–308.

[3] In this case, there obviously was a special enforcement need justifying the initial entry to extinguish the fire, and I agree that the search on the morning after the fire was a continuation of that entirely legal entry. A special enforcement need can, of course, be established on more than a case-by-case basis, especially if there is a relevant legislative determination of need. See *Marshall* v. *Barlow's, Inc., ante,* p. 325 (STEVENS, J., dissenting).

tion between sovereign and citizen.[4]   In such a case, to comply with the constitutional requirement of reasonableness, I believe the sovereign must provide fair notice of an inspection.[5]

The Fourth Amendment interests involved in this case could have been protected in either of two ways—by a warrant, if probable cause existed; or by fair notice, if neither probable cause nor a special law enforcement need existed.   Since the entry on February 16 was not authorized by a warrant and not preceded by advance notice, I concur in the Court's judgment and in Parts I, III, and IV of its opinion.

MR. JUSTICE WHITE, with whom MR. JUSTICE MARSHALL joins, concurring in part and dissenting in part.

I join in all but Part IV–A of the opinion, from which I dissent.   I agree with the Court that:

"[A]n entry to fight a fire requires no warrant, and that once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze. Thereafter, additional entries to investigate the cause of

---

[4] The Fourth Amendment ensures "[t]he right of the people to be *secure* in their persons, houses, papers, and effects, against unreasonable searches and seizures."   (Emphasis added.)   Surely this broad protection encompasses the expectation that the government cannot demand immediate entry when it has neither probable cause to suspect illegality nor any other pressing enforcement concern.   Yet under the rationale in Part II of the Court's opinion, the less reason an officer has to suspect illegality, the less justification he need give the magistrate in order to conduct an unannounced search.   Under this rationale, the police will have no incentive—indeed they have a disincentive—to establish probable cause before obtaining authority to conduct an unannounced search.

[5] See LaFave, Administrative Searches and the Fourth Amendment: The Camara and See Cases, 1967 Sup. Ct. Rev. 1.   The requirement of giving notice before conducting a routine administrative search is hardly unprecedented.   It closely parallels existing procedures for administrative subpoenas, see, *e. g.,* 15 U. S. C. § 1312 (1976 ed.), and is, as Professor LaFave points out, embodied in English law and practice.   See LaFave, *supra,* at 31–32.

the fire must be made pursuant to the warrant procedures governing administrative searches." *Ante*, at 511.

The Michigan Supreme Court found that the warrantless searches, at 8 and 9 a. m. were not, in fact, continuations of the earlier entry under exigent circumstances* and therefore ruled inadmissible all evidence derived from those searches. The Court offers no sound basis for overturning this conclusion of the state court that the subsequent re-entries were distinct from the original entry. Even if, under the Court's "reasonable time" criterion, the firemen might have stayed in the building for an additional four hours—a proposition which is by no means clear—the fact remains that the firemen did not choose to remain and continue their search, but instead locked the door and departed from the premises entirely. The fact that the firemen were willing to leave demonstrates that the exigent circumstances justifying their original warrantless entry were no longer present. The situation is thus analogous to that in *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 358–359 (1977):

> "The agents' own action . . . in their delay for two days following their first entry, and for more than one day following the observation of materials being moved from the office, before they made the entry during which they seized the records, is sufficient to support the District Court's implicit finding that there were no exigent circumstances. . . ."

To hold that some subsequent re-entries are "continuations"

---

*The Michigan Supreme Court recognized that "[i]f there are exigent circumstances, such as reason to believe that the destruction of evidence is imminent or that a further entry of the premises is necessary to prevent the recurrence of the fire, no warrant is required and evidence discovered is admissible." 399 Mich. 564, 578, 250 N. W. 2d 467, 474 (1977). It found, however, that "[i]n the instant case there were no exigent circumstances justifying the searches made hours, days or weeks after the fire was extinguished." *Id.*, at 579, 250 N. W. 2d, at 475.

of earlier ones will not aid firemen, but confuse them, for it will be difficult to predict in advance how a court might view a re-entry. In the end, valuable evidence may be excluded for failure to seek a warrant that might have easily been obtained.

Those investigating fires and their causes deserve a clear demarcation of the constitutional limits of their authority. Today's opinion recognizes the need for speed and focuses attention on fighting an ongoing blaze. The firetruck need not stop at the courthouse in rushing to the flames. But once the fire has been extinguished and the firemen have left the premises, the emergency is over. Further intrusion on private property can and should be accompanied by a warrant indicating the authority under which the firemen presume to enter and search.

There is another reason for holding that re-entry after the initial departure required a proper warrant. The state courts found that at the time of the first re-entry a criminal investigation was under way and that the purpose of the officers in re-entering was to gather evidence of crime. Unless we are to ignore these findings, a warrant was necessary. *Camara* v. *Municipal Court*, 387 U. S. 523 (1967), and *See* v. *Seattle*, 387 U. S. 541 (1967), did not differ with *Frank* v. *Maryland*, 359 U. S. 360 (1959), that searches for criminal evidence are of special significance under the Fourth Amendment.

MR. JUSTICE REHNQUIST, dissenting.

I agree with my Brother STEVENS, for the reasons expressed in his dissenting opinion in *Marshall* v. *Barlow's, Inc., ante,* at 328, that the "Warrant Clause has no application to routine, regulatory inspections of commercial premises." Since in my opinion the searches involved in this case fall within that category, I think the only appropriate inquiry is whether they were reasonable. The Court does not dispute that the entries which occurred at the time of the fire and the next morning were entirely justified, and I see nothing to indicate that the

subsequent searches were not also eminently reasonable in light of all the circumstances.

In evaluating the reasonableness of the later searches, their most obvious feature is that they occurred after a fire which had done substantial damage to the premises, including the destruction of most of the interior. Thereafter the premises were not being used and very likely could not have been used for business purposes, at least until substantial repairs had taken place. Indeed, there is no indication in the record that after the fire Tyler ever made any attempt to secure the premises. As a result, the fire department was forced to lock up the building to prevent curious bystanders from entering and suffering injury. And as far as the record reveals, Tyler never objected to this procedure or attempted to reclaim the premises for himself.

Thus, regardless of whether the premises were technically "abandoned" within the meaning of the Fourth Amendment, cf. *Abel* v. *United States*, 362 U. S. 217, 241 (1960); *Hester* v. *United States,* 265 U. S. 57 (1924), it is clear to me that no purpose would have been served by giving Tyler notice of the intended search or by requiring that the search take place during the hours which in other situations might be considered the only "reasonable" hours to conduct a regulatory search. In fact, as I read the record, it appears that Tyler not only had notice that the investigators were occasionally entering the premises for the purpose of determining the cause of the fire, but he never voiced the slightest objection to these searches and actually accompanied the investigators on at least one occasion. App. 54–57. In fact, while accompanying the investigators during one of these searches, Tyler himself suggested that the fire very well may have been caused by arson. *Id.,* at 56. This observation, coupled with all the other circumstances, including Tyler's knowledge of, and apparent acquiescence in, the searches, would have been taken by any sensible person as an indication that Tyler thought the

searches ought to continue until the culprit was discovered; at the very least they indicated that he had no objection to these searches. Thus, regardless of what sources may serve to inform one's sense of what is reasonable, in the circumstances of this case I see nothing to indicate that these searches were in any way unreasonable for purposes of the Fourth Amendment.

Since the later searches were just as reasonable as the search the morning immediately after the fire in light of all these circumstances, the admission of evidence derived therefrom did not, in my opinion, violate respondents' Fourth and Fourteenth Amendment rights. I would accordingly reverse the judgment of the Supreme Court of Michigan which held to the contrary.