**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 27, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

MARY ANTON JONES, Tenant;
MONTE TURNER, Tenant,

        Plaintiffs-Appellants,

   and

AARON KIRBY, Tenant;
RONALD LAWRENZ,
Housing Provider,

        Plaintiffs,

v.

MICHAEL WILDGEN, Individually
and in his official capacity as City
Manager; DAVID CORLISS,
Individually and in his official
capacity as City Attorney; BARRY
WALTHALL, Individually and in his
official capacity as City Building
Inspector; VICTOR TORRES,
Individually and in his official
capacity as Director of Neighborhood
Resources; CITY OF LAWRENCE,
KANSAS; LEE SMITH; SHAWN
MURPHY; BRIAN JIMENEZ,
Individually and in their official
capacities as Zoning Inspectors,

        Defendants-Appellees,

   and

DAVID DUNFIELD; SUE HACK;
MARTY KENNEDY; MIKE

No. 06-3384
(D.C. No. 03-CV-2369-KHV)
(D. Kan.)

RUNDLE; JIM HENRY;
ERV HODGES; Individually and in
their official capacities as City
Commissioners; JOHN DOE,
Individually and in his official
capacity as an employee for the City
of Lawrence, since January 1, 2000,

Defendants.

## ORDER AND JUDGMENT[*]

Before **HARTZ**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

Mary Anton Jones and Monte Turner rented single-family houses in Lawrence, Kansas, in single-family residential zoning districts ("RS" zoning districts). In 2002, City inspectors requested permission to enter the houses and inspect them, as provided for in various municipal ordinances, but both Ms. Jones and Mr. Turner refused. After obtaining administrative search warrants, City inspectors entered the houses and inspected them. They found several housing-code violations in the house Ms. Jones was renting but none in the house

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Mr. Turner was renting. The inspectors later returned to Ms. Jones's residence with another administrative search warrant and inspected the house to determine whether the violations had been corrected.

Ms. Jones and Mr. Turner then filed this civil rights action under 42 U.S.C. § 1983 against the City and several of its employees, claiming that the inspections violated their Fourth Amendment right to be free of unreasonable searches.[1] As stated in the final pretrial order, they contended that the purpose of the inspections was not to uncover health or safety violations but "to cause the tenant plaintiffs to abandon lawful use of the properties they occupied." Aplee. Supp. App. at 136. The district court granted summary judgment to appellees, determining that the searches were made pursuant to valid administrative warrants. This appeal followed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.

We review the district court's grant of summary judgment de novo, using the same legal standard applicable in the district court. *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005). Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

---

[1]    This case originally involved a number of other plaintiffs and defendants as well as a variety of claims. We discuss only the facts and claims pertinent to the issues raised in this appeal.

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under this standard, we view the evidence, and draw all reasonable inferences from it, in the light most favorable to the nonmoving party. *Baca*, 398 F.3d at 1216.

## II.

Under Chapter Six, Article Thirteen of the City's municipal code (City Code), every owner of a single-family dwelling in an RS zoning district annually must pay a $25.00 regulatory fee and obtain a rental licensing permit before leasing the dwelling to an unrelated person. City Code § 6-1302. The Code also provides that the exterior and interior of such properties must be inspected at least once every three years to ensure compliance with governing City Code provisions. *Id.* § 6-1304. The City may revoke the licensing permit if the property is in violation of the City Code or if there exists a public nuisance, which includes violations of the Uniform Housing Code. *See id.*, §§ 6-1302, 6-1305. Relevant to the inspections conducted here, the City Code further provides:

> Absent emergency circumstances, *whenever necessary to make inspection to enforce any of the provisions of this Article*, . . . the public officer or his or her authorized representative may enter such building or premises at all reasonable times to inspect the same or to perform any duty imposed by this Article, provided that such entry is pursuant to the law, and further provided that if such building or premises be occupied, the public officer shall first present proper credentials and request entry; and *if entry is denied the public officer*

-4-

> *shall have the authority to seek lawful entry pursuant to an administrative search warrant or other lawful means.*

City Code, § 6-1307 (emphases added). The City adopted this regulatory scheme based on its findings that "reasonable regulation of the rental of dwellings in single family residential zoning districts is necessary and appropriate for the general public health, safety, and welfare" and "that the public health and safety of tenants living in rental single family dwellings is enhanced with licensing and regulatory requirements on rental dwellings in single family zoned districts." Ordinance No. 7326, preamble.[2]

The Fourth Amendment "safeguard[s] the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Court*, 387 U.S. 523, 528 (1967). It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Administrative searches of structures by municipal inspectors "are significant intrusions upon the interests protected by the Fourth Amendment." *Camara,* 387 U.S. at 534.

---

[2] Because the parties have not included in their appendices a copy of Ordinance No. 7326, from which the district court quoted at length, we take judicial notice of it from a copy available electronically from the district court's docket.

In *Camara*, the Supreme Court held that a routine periodic inspection of a structure "is a 'reasonable' search of private property within the meaning of the Fourth Amendment," and explained that "'probable cause' to issue a warrant to inspect must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Id.* at 538. Those standards, "which will vary with the municipal program being enforced, may be based upon the passage of time, *the nature of the building* (*e.g.*, a multi-family apartment house), or the condition of the entire area, but they will not depend upon specific knowledge of the condition of the particular dwelling." *Id.* (emphasis added). "If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." *Id.* at 539. As we have explained, in issuing an administrative warrant, the judicial officer "is not to give any consideration at all to the reliability of the evidence or the probability of violation." *Marshall v. Horn Seed Co., Inc.*, 647 F.2d 96, 100 (10th Cir. 1981). Instead, the judicial officer's "role is limited to verifying that the proposed search conforms to the 'broad legislative or administrative guidelines specifying the purpose, frequency, scope, and manner of conducting the inspections.'" *Id.* (quoting *Michigan v. Tyler*, 436 U.S. 499, 507 (1978)).

Recognizing that under the foregoing standards, administrative warrants to perform routine inspections "issue upon recitation of the ordinance scheme"

rather than upon a showing of probable cause that a violation may exist in the targeted dwelling, Ms. Jones and Mr. Turner suggest that "the real issue is whether the ordinance scheme . . . is based on 'reasonable legislative or administrative standards.'" Aplt. Br. at 6. They contend that they presented evidence to the district court that established genuine issues of material fact as to this question. But we see little or no connection between the evidence to which they point (the applicability of which is unsupported by any legal authority) and the inquiry they appear to ask of us. Specifically, they first recite their subjective views of the condition of the houses they rented and the results of the inspections. Ms. Jones states that she had no health or safety concerns about her house, yet violations were found. In contrast, Mr. Turner states that he had concerns that the house he rented had housing-code violations, but the inspection uncovered none.

Ms. Jones and Mr. Turner have not explained, and we fail to see, how their subjective opinions of the condition of their respective residences are relevant to whether the City's rationale for implementing the ordinance scheme—to enhance the health and safety of both the general public and those living in single-family rental dwellings in RS zoning districts—is grounded in reasonable legislative or administrative standards or serves a valid public interest. *See Camara,* 387 U.S. at 538-39. And to the extent they are instead challenging the existence of probable cause to issue the warrants to inspect their residences, whether or not there were violations (and whether or not they thought there were violations) is

irrelevant to the analysis. *See Marshall*, 647 F.2d at 100.[3]  Furthermore, nothing in the record suggests that appellants' residences were not the type of building encompassed by the applicable ordinance scheme.

Relying solely on Mr. Turner's affidavit, appellants next contend that they "produced evidence from the City's own employees that certain deficiencies in rental property are allowed to continue, despite the failure of those deficiencies to comply with current City Codes related to health and safety issues."  Aplt. Br. at 7.  But nothing in that affidavit supports their point.  The only portion of the affidavit referencing any "evidence from the City's own employees" concerns a purported telephone conversation with an unidentified City employee on the day Mr. Turner's residence was to be inspected.  Mr. Turner states that during the conversation, he was never informed that the purpose of the inspection was to assure his health and safety.  Whether or not he was informed of the purpose underlying the inspection simply has no bearing on whether the City's ordinance scheme is based on reasonable legislative or administrative standards or serves a valid public interest, or whether there was probable cause to issue the warrant to inspect Mr. Turner's residence.

---

[3]     Mr. Turner's opinion that his house had code violations is set forth in his affidavit, the admissibility of which appellees question under Fed. R. Evid. 602. Rule 602 mandates that testimony must be based on personal knowledge.  We need not resolve this issue given our view that Mr. Turner's testimony on this point is irrelevant.

Appellants' remaining line of argument is that "although the City professes concern for the health and safety of tenants," it "has sought no warrants for inspection of affected properties for several years' time," "does not know the number of properties subject to the Ordinance scheme; where those properties are located; or who occupies the properties," and "[m]ost of the complaints under the ordinance scheme arise from one city neighborhood, the Centennial neighborhood." Aplt. Br. at 7-8. In support of this line of argument, appellants broadly cite to entire deposition excerpts of the testimony of two defendant-City employees comprising approximately twenty pages.

After scouring the entirety of these deposition transcripts, we see little support for this line of argument other than an admission that defendant Walthall did not know the number of properties potentially subject to the ordinances, *see* Aplt. App. at 54, and a concession that most complaints arise from the Centennial neighborhood, *see id.* at 61. These admissions, even taken together with appellants' other unsupported arguments, show only that the City's administration of its regulatory scheme may be imperfect, not that there is a genuine issue of material fact as to whether the scheme is grounded in reasonable legislative or administrative standards or serves a valid public purpose, namely, protecting the health, safety, and welfare of the general public and those that rent houses in RS zoning districts. And appellants have pointed to no evidence supporting the contention set out in the Pretrial Order, that the inspections of their residences

-9-

were conducted "to cause [them] to abandon lawful use of the properties they occupied" rather than for their health and safety. Aplee. Supp. App. at 136.

Accordingly, this claim presents no genuine issue of fact that precludes summary judgment.

## III.

The judgment of the district court is AFFIRMED.

Entered for the Court


Timothy M. Tymkovich
Circuit Judge